El Juez Asociado Señor Rivera García
emitió la opinión del Tribunal.
En esta ocasión nos corresponde interpretar el Art. 36-A de la Ley Núm. 103 de 5 de abril de 2003, según enmen-dada, conocida como Ley de Condominios, 31 L.P.R.A. sec. 1293-1. Específicamente, debemos determinar el momento preciso en el cual un desarrollador que asumió los gastos de mantenimiento durante la administración interina del edificio, tiene la potestad de iniciar el cobro de la cuota de mantenimiento a los condominos. Dicha gestión, ¿puede iniciarse tan pronto se enajene el porciento de apartamen-tos que estableció el desarrollador en la escritura matriz *949 del régimen, o cuando se concluya el traspaso de la admi-nistración al Consejo de Titulares?
i — I
El Condominio Portal de Sofía (Condominio) es un com-plejo residencial ubicado en el Municipio de Guaynabo que alberga 130 unidades de vivienda distribuidas en 17 edifi-cios de apartamentos. El 21 de enero de 2005 el desarro-llador del proyecto, Portal de Sofía, Inc. (Desarrollador o peticionario), otorgó una Escritura Matriz Estableciendo Régimen de Condominios del Condominio Portal de Sofia.(1) Mediante este instrumento público, el Desarrolla-dor sometió el Condominio al régimen de propiedad horizontal.
Entre los asuntos delimitados en la Escritura Matriz se encuentra la administración interina del Condominio. Al respecto, el Desarrollador optó por asumir los gastos de mantenimiento de las áreas comunales hasta que se ven-diera el 75% del total de los apartamentos. En lo perti-nente, la Escritura Matriz dispone lo siguiente:
El DESARROLLADOR asumirá la administración interina del Condominio con todos los poderes y derechos que le con-fiere e impone la Ley de Condominios, esta escritura y el re-glamento a la Junta de Directores y sus oficiales, y transferirá la administración del Condominio al Consejo de Titulares al venderse y entregarse las unidades que representen el setenta y cinco [por ciento] (75%) de las unidades del Condominio. Mientras EL DESARROLLADOR venda unidades en el Con-dominio, ... este cobrará por adelantado a los adquirientes de los apartamentos el equivalente a tres (3) meses de cuotas de mantenimiento, dos (2) de los cuales serán abonados al fondo de reserva del Condominio. Las cuotas equivalentes al otro mes restante, serán depositadas por EL DESARROLLADOR en mía cuenta para beneficio del Consejo de Titulares, cuyo manejo será transferido a la Junta de Directores al momento *950 de la transferencia de la administración del Condominio. Dichos fondos depositados en esta cuenta no serán utilizados para el pago de los gastos comunes del Condominio mientras EL DESARROLLADOR tenga a su cargo la administración interina del Condominio. El DESARROLLADOR comenzará a pagar las cuotas de mantenimiento de aquellas unidades que no se hayan segregado en fincas filiales una vez se haya tras-pasado la administración del Condominio a la nueva Junta de Directores y cobrará por adelantado a los adquirentes de las unidades las cuotas por tres (3) meses, dos (2) de los cuales serán para el fondo de reserva y el restante será para el pago del primer mes en que el nuevo titular sea dueño del apartamento. El DESARROLLADOR entregará dichos pagos a la Junta de Directores según EL DESARROLLADOR vaya vendiendo las unidades a los nuevos Titulares(2)
La venta del 75% de las unidades culminó el 5 de octu-bre de 2005 con la entrega del apartamento número 98 del proyecto. En atención a ello, el Desarrollador convocó a una asamblea de condominos para el 19 de octubre del mismo año para transferir la administración del Condomi-nio al Consejo de Titulares. Durante la reunión, uno de los titulares planteó que el Consejo de Titulares no estaba pre-parado para asumir la administración del Condominio, por lo que solicitó que se configurara un Comité de Transición.(3) El Desarrollador accedió a dicho petitorio, pero enfatizó que el traspaso tenía que culminar durante el mes de octubre debido a que "la comunidad [tenía] que comenzar a costear los gastos de mantenimiento”.(4) En ese sentido, el Desarrollador también manifestó su intención de comenzar a cobrar la cuota de mantenimiento a partir del 1 de noviembre de 2005.
Así las cosas, el 31 de octubre de 2005 el Desarrollador circuló un memorando a los titulares en el cual requirió el pago de la cuota de mantenimiento correspondiente a no-viembre de 2005. Solamente 47 de los titulares pagaron la *951 cuota exigida por el Desarrollador para el referido mes. Finalmente, el 28 de noviembre de 2005 el Desarrollador entregó la administración interina del Condominio al Con-sejo de Titulares.
Posteriormente, el 6 de febrero de 2006, el Consejo de Titulares presentó una querella contra el Desarrollador ante el Departamento de Asuntos del Consumidor (DACo) por incumplimiento en el proceso de entrega de la adminis-tración interina del Condominio. Entre sus alegaciones, el Consejo de Titulares señaló que el Desarrollador cobró ile-galmente la cuota de mantenimiento correspondiente a no-viembre de 2005, en contravención al Art. 36-A(a)(l) de la Ley de Condominios, 31 L.P.R.A. sec. 1293-l(a)(l). Así, so-licitó —entre otros remedios— que DACo le ordenara al Desarrollador que reembolsara el pago recibido por este concepto a los respectivos titulares.(5) El Desarrollador, por su parte, se opuso a la referida querella. Asimismo, solicitó a la agencia que desestimara la reclamación o que dispu-siera de ella sumariamente.
Luego de varios trámites procesales, el 24 de enero de 2007 se llevó a cabo la vista administrativa. Durante la audiencia, el Consejo de Titulares se allanó al plantea-miento del Desarrollador en cuanto a la ausencia de con-troversia sobre los hechos materiales del caso. Subsiguien-temente, dicha parte renunció a su derecho a vista y aceptó que la querella se resolviera mediante el proceso sumario.
En atención a lo anterior, el 19 de febrero de 2008, DACo dictó una Resolución Sumaria. Resolvió que el Desa-rrollador incumplió con el proceso establecido en el Art. 36-A (c), (d) y (f) de la Ley de Condominios, supra, 31 L.P.R.A. sec. 1293-1(c), (d) y (f), para el traspaso de la ad-ministración interina. Razonó que, si bien las disposiciones de los referidos incisos se activaban una vez se vendiera el 75% de los apartamentos, el Desarrollador —como admi- *952 nistrador interino— mantenía su obligación de sufragar los gastos de mantenimiento, según estaba dispuesto en la Escritura Matriz hasta tanto el traspaso de la administra-ción fuera efectivo. En vista de que la transferencia oficial de la administración del Condominio al Consejo de Titula-res se materializó el 28 de noviembre de 2005, DACo con-cluyó que el Desarrollador estaba impedido de cobrar la cuota de mantenimiento correspondiente a noviembre de 2005. Así, pues, condenó al Desarrollador a reembolsar al Consejo de Titulares la cantidad cobrada por ese concepto. La cuantía recibida sería, a su vez, acreditada a la cuenta de mantenimiento de los respectivos titulares.
Insatisfecho con el referido dictamen, el Desarrollador acudió al Tribunal de Apelaciones mediante un recurso de revisión de decisión administrativa. El 31 de octubre de 2008 el foro apelativo intermedió dictó una sentencia y confirmó la determinación recurrida. El tribunal a quo ra-tificó la interpretación que efectuó DACo del Art. 36-A de la Ley de Condominios, supra, y concluyó que el Desarro-llador estaba impedido de cobrar las cuotas de manteni-miento hasta tanto finalizara el proceso de traspaso de la administración al Consejo de Titulares.
Aún inconforme, el Desarrollador presenta ante este Tribunal el recurso de certiorari de epígrafe en el que nos señala el error siguiente:
Erró el Honorable Tribunal de Apelaciones al sostener la Re-solución Sumaria del Departamento de Asuntos del Consumi-dor que resuelve que un desarrollador “está impedido de” co-brar las cuotas de mantenimiento durante su administración interina hasta tanto haya traspasado la administración al Consejo de Titulares de un condominio, a[u]n cuando se acogió a la alternativa de asumir las cuotas por concepto de mante-nimiento hasta que se vendiera el setenta y cinco por ciento (75%) del total de las unidades, de conformidad con el Artículo 36-A de la Ley de Condominios.
Atendido el recurso, el 15 de mayo de 2009 expedimos el auto de certiorari solicitado. Contando con el beneficio de *953 la comparecencia de ambas partes, así como con el alegato presentado por DACo, resolvemos.
1 — 1 HH
La controversia medular que se nos plantea en el pre-sente caso se relaciona con la facultad de un desarrollador —como administrador interino de un inmueble sujeto al régimen de propiedad horizontal— para cobrar la cuota de mantenimiento a los titulares, una vez se alcanza el por-ciento de unidades vendidas establecido en la Escritura Matriz del régimen. En particular, debemos precisar el mo-mento en que se activa la obligación de los titulares de pagar las mensualidades para el mantenimiento del edifi-cio: (1) una vez se logra la venta del 51% o del 75% de las unidades que componen el complejo, según lo pactado en la Escritura Matriz, o (2) tan pronto culmina el proceso de transición de la administración interina del edificio y el desarrollador hace la entrega oficial al Consejo de Titulares. Para eso, nos corresponde analizar el alcance del Art. 36-A de la Ley de Condominios, supra.
A. El régimen de propiedad horizontal se adoptó en nuestra jurisdicción con un fin dual: proveerle al ciudadano la posibilidad de disfrutar el derecho a la propiedad plena e individual de un inmueble ubicado en un edificio, a la vez que se logra maximizar el uso del terreno escaso con el que cuenta el país.(6) En el 2003 el esquema jurídico sobre el régimen de horizontalidad en Puerto Rico fue objeto de una revisión extensiva para dotarlo de mayor eficacia en la consecución de su objetivo inicial.(7) El resultado fue la aprobación por parte de la Asamblea Legislativa de *954 la Ley de Condominios, Ley Núm. 103, supra, legislación que logra atemperar los intereses de los desarrolladores y de la comunidad financiera a los derechos de los consumi-dores, aunque estos últimos son considerados con carácter prioritario.(8)
Entre los asuntos que aclara y amplía la Ley de Condo-minios se encuentran las prerrogativas y obligaciones del desarrollador de un edificio sujeto al régimen de propiedad horizontal —como administrador inicial del inmueble— para con los titulares, en particular respecto a los costos de mantenimiento de las áreas comunes mientras existan apartamentos para la venta. M.J. Godreau, La Nueva Ley de Condominios, San Juan, Ed. Dictum, 2003, pág. 13. Asi-mismo, la ley detalla el proceso de transición que se debe seguir para el sano traspaso de la administración interina al Consejo de Titulares. íd.
En lo referente al pago de cuotas de mantenimiento, es de conocimiento general que según el régimen de propiedad horizontal, los condominos tienen la obligación de aportar proporcionalmente a los gastos de administración, conservación y reparación de las áreas comunes generales del edificio. Art. 41 de la Ley de Condominios, supra, 31 L.P.R.A. sec. 1293e. No obstante, la Ley de Condominios establece en su Art. 36-A una excepción a este deber legal en aquellos casos en donde el inmueble sujeto al régimen de propiedad horizontal sea de nueva construcción. Ante esas circunstancias, la activación de la obligación de los propietarios para aportar a los gastos de mantenimiento del edificio está condicionada a las responsabilidades que asuma el desarrollador como administrador interino. Veamos.
El Art. 36-A de la Ley de Condominios, supra, provee al desarrollador dos opciones para la administración *955 interina del inmueble enfocadas en el cobro de las cuotas de mantenimiento. En ese sentido, el desarrollador podrá elegir entre: (1) asumir la totalidad de los gastos de man-tenimiento de los elementos comunales hasta que se venda el 51% o el 75%, a su discreción, o (2) cobrar a los titulares de los apartamentos —desde la primera venta— la parte proporcional del mantenimiento de las áreas y facilidades comunales que le corresponda sobre un presupuesto anual. 31 L.P.R.A. sec. 1293-l(a)(l). El modelo seleccionado por el desarrollador tendrá que constar en la escritura matriz del régimen y constituirá su pauta a seguir en la administra-ción del edificio. Arts. 22 y 36-A de la Ley de Condominios, supra, 31 L.P.R.A. secs. 1292 y 1293-1.
Bajo el primer modelo de administración, el desarrolla-dor asume el costo del mantenimiento de las áreas y los elementos comunes desde que realiza la primera venta, momento cuando comienza su administración interina. Art. 36-A(a)(l)(A), 31 L.P.R.A. sec. 1293-l(a)(l)(A). Una lectura aislada de la porción del Art. 36-A, que regula la referida opción de administración, refleja que la asunción de los costos de mantenimiento por parte del desarrollador subsiste hasta que se venda el porciento de apartamentos estipulado en la escritura matriz. A esos efectos, el citado artículo dispone que bajo esa opción de administración, el desarrollador “asumir [á] la totalidad de los gastos de man-tenimiento de las áreas y facilidades comunales hasta que se venda el cincuenta y un por ciento (51%) o el setenta y cinco por ciento (75%)” de los apartamentos. (Enfasis suplido.) Id.
A pesar de lo anterior, cuando estudiamos de forma integral el Artículo 36-A, surgen ciertas incongruencias entre la citada parte del artículo y aquella destinada a la regu-lación del traspaso de la administración del edificio al Con-sejo de Titulares. Por un lado, el estatuto dispone que el deber asumido discrecionalmente por el desarrollador —como parte de su administración interina— de sufragar los gastos de mantenimiento de los elementos comunes del *956 inmueble, subsiste hasta que se enajene el porcentaje de apartamentos determinado en la escritura matriz. Mien-tras tanto, más adelante en el mismo articulado se indica palmariamente que la administración interina del desarro-llador finalizará una vez concluya el proceso de transición y el Consejo de Titulares seleccione a la Junta de Directores. Art. 36-A(c) y (d) de la Ley de Condominios, supra.
Ciertamente la redacción del Artículo 36-A induce a confusión. Ello debido a que aparenta segregar el inicio del cobro de las cuotas de mantenimiento del proceso de tras-paso de la administración al Consejo de Titulares. No obs-tante, un estudio ponderado del referido artículo revela que tal dicotomía es ficticia e inexistente.
En principio, debemos recordar que la obligación del de-sarrollador de sufragar los gastos de mantenimiento de las áreas comunales surge como parte de uno de los dos mode-los de administración interina que provee la Ley de Condominios. A esos efectos, el Art. 36-A dispone lo si-guiente:
(a) La administración interina comenzará tan pronto se venda el primer apartamiento. ...
(1) A partir de la primera venta, el desarrollador tendrá las siguientes opciones para la administración interina:
(A) Asumir la totalidad de los gastos de mantenimiento de las áreas y facilidades comunales hasta que se venda el cincuenta y un por ciento (51%) o el setenta y cinco por ciento (75%), a discreción del desarrollador de los apartamientos ...; o
(B) Cobrarle a los titulares de los apartamientos vendi-dos, la parte proporcional del mantenimiento de las áreas y facilidades comunales conforme al porcentaje dispuesto en [el Art. 22], sobre un presupuesto anual que preparará el desa-rrollador de conformidad con lo que más adelante se establece en la cláusula (6) del inciso (b). 31 L.P.R.A. sec. 1293-1.
Además, en este análisis debemos considerar que la re-gulación del procedimiento de traspaso de la administra-ción interina está igualmente subordinada al esquema ad-ministrativo que el desarrollador seleccione. En primer *957 lugar, el momento en que procede iniciar la transición de la administración varía entre las alternativas de administra-ción interina provistas en el Art. 36-A de la Ley de Condo-minios, supra. Cuando el desarrollador opta por asumir los costos de mantenimiento, la transición debe comenzar tan pronto se enajena el porciento de los apartamentos estable-cido en la escritura matriz del régimen, a saber, el 51% o 75% de las unidades proyectadas. Art. 36-A(a)(2), 31 L.P.R.A. sec. 1293-l(a)(2). Mientras tanto, si el desarrolla-dor elige cobrar las cuotas de mantenimiento a partir de la primera venta, el traspaso de la administración procederá tan pronto los condominos seleccionen a las personas que estarán a cargo de dicha tarea en una reunión extraordi-naria, la cual podrán convocar los titulares en cualquier momento o el desarrollador, una vez se haya individuali-zado y enajenado el 51% de las unidades disponibles para la venta. Art. 36-A(c)(l) y (2), 31 L.P.R.A. sec. 1293-l(c)(l) y (2).
En segundo lugar, los requisitos que deben reunir los documentos a ser entregados durante el traspaso, particu-larmente los libros de cuentas de la administración, tam-bién difieren entre ambos sistemas de administración. Si el des arrollador optó por asumir los gastos de manteni-miento, este tiene la ventaja de poder traspasar la admi-nistración interina al Consejo de Titulares sin presentar informes auditados relacionados con su gestión. Godreau, op. cit., pág. 36. Este beneficio dista del escenario de tran-sición según la segunda forma de administración, en donde el desarrollador se ve en la obligación de someter informes auditados, entre otros documentos, como parte del proceso de traspaso de administración. Art. 36-A(c) de la Ley de Condominios, supra. Ello es así debido a que el desarrolla-dor comienza a cobrar la cuota de mantenimiento tan pronto vende el primer apartamento. Godreau, op. cit., pág. 36.
Así las cosas, resulta necesario interpretar a fondo las *958 disposiciones del Art. 36-A de la Ley de Condominios, supra, para aclarar el momento preciso en el que nace el deber legal de los condominos de pagar las cuotas para el mantenimiento de las áreas comunes del edificio en aque-llos casos en donde el desarrollador haya asumido dicha obligación como parte de su administración interina del inmueble.
B. A la hora de interpretar estatutos nos debemos dirigir por la norma cardinal en materia de hermenéutica, a saber: “Cuando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu.” Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Esta pauta, sin embargo, no implica que ante un estatuto claro este Tribunal se encuentra impedido de ejercer su función como intérprete de las leyes. Por el contrario, en múltiples ocasiones hemos expresado que todas las leyes, tanto las oscuras como aquellas más claras, requieren interpretación. Soc. Asist. Leg. v. Ciencias Forenses, 179 D.P.R. 849 (2010); Pueblo v. Zayas Rodríguez, 147 D.P.R. 530, 538 (1999); Vélez v. Srio. de Justicia, 115 D.P.R. 533, 544 (1984).
Cónsono con lo anterior, los tratadistas Bernier y Cue-vas Segarra comentan que
[a]l aplicar una ley siempre es necesario interpretarla. ... Eso es así ya sean oscuras o claras las palabras de la ley, por lo que se puede decir que es falso afirmar que sólo las leyes oscuras deben ser interpretadas. R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, San Juan, Pubs. J.T.S., 1987, Vol. 1, pág. 259.
Esto se debe a que el fin de la hermenéutica legal es descubrir y determinar cuál fue la voluntad de la Asamblea Legislativa al aprobar el estatuto examinado. Cuevas Segarra, op. cit., pág. 241. Así, pues, en nuestra faena como intérprete final de las leyes estamos obligados a lograr una exégesis que se ajuste al propósito y a la política pública que inspiró el estatuto. Rodríguez u. Syntex, 160 D.P.R. *959 364, 382 (2003); Díaz Marín v. Mun. de San Juan, 117 D.P.R.. 334, 342 (1986); Esso Standard Oil v. A.P.P.R., 95 D.P.R. 772, 785 (1968).
En consecución con el referido deber, el tribunal debe evitar apegarse “ciegamente” a la letra de la ley en aque-llos casos en donde el espíritu y fin del estatuto no queden reflejados diáfanamente en su texto. Véanse: Soc. Asist. Leg. v. Ciencias Forenses, supra; Alonso García v. S.L.G., 155 D.P.R. 91, 99 (2001). A esos efectos, hemos señalado que “cuando el lenguaje de un estatuto no muestra clara-mente la intención legislativa, es necesario rechazar la in-terpretación literal, cuando ésta es claramente contraria a la verdadera intención o el propósito legislativo”. Sucn. Alvarez v. Srio. de Justicia, 150 D.P.R. 252, 274 (2000), citando a. Mun. San Juan v. Banco Gub. Fomento, 140 D.P.R. 873, 884 (1996).
El significado literal de un estatuto es aquel que surge de sus palabras, considerándolas en su sentido natural y corriente. Bernier y Cuevas Segarra, op. cit., pág. 275. Al armonizar esta definición con los principios antes enunciados, coincidimos con la glosa en que
[ajunque generalmente es obligación del juzgador hacer valer la letra de la ley, no debe adoptarse una interpretación literal si la misma es contraria a la intención auténtica y el verda-dero propósito del legislador, según esa intención y ese propó-sito surjan de los propios términos de la ley. íd., pág. 277.
En esa misma línea, en Pueblo v. Tribunal Superior, 104 D.P.R. 363, 366 (1975), sostuvimos lo siguiente:
Aun cuando el idioma en su interpretación literal contradiga el propósito de una disposición estatutaria, lo que debe ceder es el idioma y no la realidad que motiva el estatuto. Importa en consecuencia penetrar la superficie verbal del problema ante nos, precisar el diseño y la razón de ser de las disposicio-nes legales que aquí nos ocupan, sopesar los intereses en juego, para intentar acercarnos a la interpretación más justiciera. Véase, además, Sucn. Alvarez v. Srio. de Justicia, supra, pág. 275.
*960 Como parte del ejercicio requerido para auscultar y descubrir la verdadera intención del legislador, el tribunal debe examinar el estatuto en su totalidad y considerar el contexto según el cual se aprobó. En otras palabras, cada una de sus partes se debe examinar y comparar las unas con las otras de forma tal que éstas sean compatibles entre ellas y que logren el fiel cumplimiento del propósito de la Asamblea Legislativa. Bernier y Cuevas Segarra, op. cit., pág. 315. De acuerdo con este principio de hermenéutica, no hay cabida para el análisis aislado de los distintos apartados de la ley. Bomberos Unidos v. Cuerpo Bomberos et al., 180 D.P.R. 723 (2011); S.L.G. Hernández-Beltrán v. TOLIC, 151 D.P.R. 754, 764-765 (2000). Véase, además, Bernier y Cuevas Segarra, op. cit., pág. 315. “La determinación que un tribunal haga debe asegurar el resultado que el legislador quiso obtener al crear la ley.” Mun. de Utuado v. Aireko Const. Corp., 176 D.P.R. 897, 909 (2009). Véanse: Río Const. Corp. v. Mun. de Carolina, 153 D.P.R. 615, 621 (2001); Chase Manhattan Bank v. Mun. de San Juan, 126 D.P.R. 759, 766 (1990).
El sistema de interpretación estatutaria enfocado en el verdadero cumplimiento de la intención legislativa cobra mayor relevancia cuando nos enfrentamos a una ley cuyo contenido es confuso. En Sucn. Álvarez v. Srio. de Justicia, supra, pág. 274, reafirmamos que
[a]nte la letra de una ley ambigua o incierta tenemos la obli-gación de inclinarnos “hacia aquella solución que mejor capte el impacto del estatuto en términos del bienestar general y que mejor perciba la intención legislativa al adoptar la norma en-filada a propiciar el interés público ...”. (Énfasis en el original.) Citando a Goss, Inc. v. Dycrex Const. & Co., S.E., 141 D.P.R. 342, 356-357 (1996).
La voluntad de la Asamblea Legislativa al adoptar el estatuto se puede indagar a través del historial legislativo de la disposición legal. Pueblo v. Zayas Rodríguez, supra. Como regla general, este recoge el propósito que *961 inspiró su creación. Otra fuente que puede arrojar luz so-bre la intención del legislador en la aprobación de la ley es las manifestaciones de los miembros del cuerpo durante el trámite legislativo. Bernier y Cuevas Segarra, op. cit., pág. 242. Esto incluye los datos recogidos en el informe emitido por la comisión legislativa que estudió el proyecto de ley y las expresiones de los legisladores en el hemiciclo durante la sesión de aprobación del estatuto, según recogidas en el Diario de Sesiones. Id.
En este ejercicio debemos tener presente que la inten-ción legislativa vinculante es aquella que esbozó la mayo-ría de los legisladores. P.S.P. v. E.L.A., 107 D.P.R. 590, 604-605 (1978). Ello es así, ya que es la voluntad de la mayoría de los miembros del cuerpo la que constituye la intención de la Asamblea Legislativa y, por consiguiente, el auténtico significado del estatuto examinado. Bernier y Cuevas Segarra, op. cit., pág. 242.
III
Según indicamos previamente, el Art. 36-A de la Ley de Condominios, supra, resulta confuso al examinarlo en su totalidad. Por una parte, el artículo aparenta limitar la obligación que asumió el desarrollador de sufragar los cos-tos del mantenimiento del edificio —como parte de la ad-ministración interina del inmueble— hasta la venta del porcentaje de apartamentos establecido al momento de la constitución del régimen; mientras, por el otro lado, el ar-tículo establece que la administración interina culminará una vez se seleccione la Junta de Directores del Consejo de Titulares. La incongruencia en el estatuto es patente y real si consideramos que la asunción de los gastos de manteni-miento que hace el desarrollador surge como parte de uno de los modelos de administración interina que provee el propio Art. 36-A.
El peticionario, respecto a este asunto, sostiene en su *962 alegato que la Ley de Condominios es precisa al establecer que la obligación de los titulares de aportar a los costos de mantenimiento se activa tan pronto se vende el porcentaje de unidades que seleccionó el desarrollador en la escritura matriz. Añade que a partir de ese momento y hasta que se transfiera la administración al Consejo de Titulares, el de-sarrollador, “como administrador interino”, tiene la facul-tad en ley para cobrarle a los titulares las cuotas de man-tenimiento correspondientes.(9) Esta argumentación fundada en una interpretación literal del primer inciso del Art. 36-A de la Ley de Condominios, supra, no nos convence.
En primer lugar, entendemos que dicha exégesis resulta ilógica cuando se evalúa según la totalidad del Art. 36-A. En nuestra exposición del derecho señalamos que la asun-ción del desarrollador de los costos de mantenimiento del edificio acarrea un beneficio al momento del traspaso de la administración al Consejo de Titulares; a saber, la posibi-lidad de entregar la administración sin la necesidad de so-meter informes auditados de su gestión.(10) La exención de esta carga se encuentra sustentada en el hecho de que el des arrollador no ha tenido que cobrar cuotas de manteni-miento a los condominos.(11) Por lo tanto, no ha manejado ni utilizado fondos pertenecientes al Consejo de Titulares de los cuales tenga que rendir cuentas específicas respecto a su destino y administración como ocurre con el otro mé-todo de administración interina.
Consecuentemente, resolver que el desarrollador sí puede recolectar las referidas cuotas antes de culminar el traspaso de la administración, desencadenaría en la exi-gencia de tener que entregar informes auditados del pe-ríodo durante el cual recibió y administró dichos fondos. Este efecto, definitivamente desvirtuaría uno de los atribu- *963 tos del modelo de administración que provee para que el desarrollador asuma los gastos de mantenimiento.
Por otro lado, también consideramos que la interpreta-ción propuesta por el peticionario se aparta del propósito perseguido por la Asamblea Legislativa con la aprobación de la Ley de Condominios. Al examinar la exposición de motivos del estatuto encontramos que uno de los aspectos que se pretendió proteger y atender “prioritariamente” era el derecho de los consumidores.(12) Cónsono con ello, el le-gislador, en su explicación general de la citada legislación, hizo referencia a las nuevas normas recogidas en el Art. 36-A mediante las expresiones siguientes:
Por otro lado, para atender más adecuadamente el derecho de los consumidores, se detallan las obligaciones del desarro-llador desde la venta del primer apartamiento hasta el mo-mento de entregar la administración interina del condominio.
El desarrollador tendrá la opción, por un lado, de asumir to-dos los costos de mantenimiento de las áreas comunes hasta que haga entrega de la administración, o por el otro, de co-brarle a los titulares la parte proporcional de dichos costos de acuerdo al porcentaje asignado a cada apartamiento en la es-critura matriz, debiendo el desarrollador aportar el porcentaje restante por los apartamientos no vendidos o construidos aún. (Énfasis suplido.) Exposición de Motivos de la Ley Núm. 103, supra, 2003 (Parte 1) Leyes de Puerto Rico 355, 357-358.
El texto antes citado coincide con las manifestaciones que expuso la Comisión de Desarrollo Urbano y Vivienda de la Cámara de Representantes en el informe sometido con relación a la propuesta Ley de Condominios.(13) En ese sentido, tanto el mencionado informe como la exposición de motivos del estatuto evidencian patente e inequívocamente que la intención del legislador al ofrecer como opción de administración interina que el desarrollador asumiera las cuotas de mantenimiento, fue que dicha obligación subsis- *964 tiera hasta tanto se “[hiciera] entrega de la administra-ción” al Consejo de Titulares. Dicho traspaso, según indi-camos previamente, culmina con la elección por los condominos de la Junta de Directores.
De otra parte, el Art. 36-A dispone específicamente cómo se debe interpretar su contenido. En la misma línea de la antes citada exposición de motivos, el referido artículo es-tablece palmariamente que “[e]ste Artículo se interpretará restrictivamente en protección de los derechos de los titulares”. (Énfasis suplido.) Art. 36-A de la Ley de Condo-minios, supra. Esto implica que en el ejercicio de nuestra facultad interpretativa, la exégesis adoptada se debe incli-nar a favorecer a los condominos en la medida que el con-tenido del artículo así lo permita.
De acuerdo con la discusión que antecede, opinamos que el texto literal del Art. 36-A respecto al modelo de adminis-tración interina que provee para que el desarrollador asuma los gastos de mantenimiento debe ceder ante el resto del contenido del artículo y el propósito que lo inspiró. Coincidimos con DACo en que la venta del porcen-taje de apartamentos seleccionado por el desarrollador tiene el único efecto práctico de activar las disposiciones correspondientes al proceso de transición y traspaso de la administración al Consejo de Titulares. No es sino hasta que se efectúe el traspaso de la administración mediante la elección de la Junta de Directores, que los condominos vie-nen obligados a contribuir a los gastos de mantenimiento del edificio.
Ir más allá de eso y concluir que desde el momento de la enajenación del porciento de unidades establecido en la es-critura matriz los titulares están obligados a aportar a los gastos de mantenimiento, constituiría un desfase respecto a los derechos de los consumidores —en este caso los con-dominos— debido a que tendrían que pagar por el mante-nimiento del inmueble cuando su administración aún está en manos del desarrollador. Según ese supuesto fáctico, los *965 titulares quedarían desprovistos de protección en cuanto al manejo que haga el desarrollador de los fondos recolecta-dos por ese concepto durante el período que dure el proceso de transición. Ello es así, ya que el desarrollador no tiene el deber legal de someter informes auditados de su gestión como administrador interino cuando opta por asumir los costos de mantenimiento del edificio.

Concluimos, por esto, que el desarrollador de un inmueble sujeto al régimen de horizontalidad que ha asumido los gastos de mantenimiento durante la administración interina, está impedido de cobrar las cuotas de mantenimiento a los condominos si no ha cesado en sus funciones como tal. Asimismo, resolvemos que la obligación del desarrollador de sufragar los costos de mantenimiento se extingue una vez culmina el proceso de traspaso de la administración del edificio al Consejo de Titulares mediante la elección de la Junta de Directores. De igual forma, es a partir de ese momento en que nace la obligación de los titulares de aportar a los costos de mantenimiento del edificio.

IV
Pautada la interpretación aplicable al Art. 36-A de la Ley de Condominios, nos resta resolver si en el presente caso el peticionario incidió al cobrar las cuotas de mante-nimiento correspondientes a noviembre de 2005.
En el caso de autos no existe controversia en cuanto al método de administración interina que seleccionó el peticionario. La Escritura Matriz del régimen del Condo-minio Portal de Sofía refleja que el peticionario —como de-sarrollador del edificio— optó por asumir los gastos de mantenimiento de las áreas y los elementos comunes hasta que se enajenara el 75% del total de los apartamentos. Dicho porcentaje fue alcanzado el 5 de octubre de 2005, fecha a partir de la cual el peticionario estaba facultado para *966 iniciar el proceso de traspaso de la administración al Con-sejo de Titulares.
Conforme a lo anterior, el peticionario convocó a una asamblea de titulares para el 19 de octubre del mismo año. Se deduce de la Minuta de la asamblea que el Consejo de Titulares se negó a recibir la administración del edificio en ese momento porque no se había conformado un comité de transición que recibiera la documentación pertinente a la administración del inmueble. Contrario a lo que alega el peticionario, esta actuación del Consejo de Titulares no puede operar en su contra e inclinar la balanza a favor del desarrollador para resolver este pleito. Esto se debe a que el mismo Art. 36-A(e) le confiere expresamente a los titu-lares la opción de elegir un comité de transición que atienda todo el proceso de traspaso de la administración. 31 L.P.R.A. sec. 1293-l(e).
Así las cosas, al amparo de la norma previamente pau-tada, el peticionario estaba impedido de recolectar o reali-zar gestiones conducentes a cobrar a los condominos las cuotas de mantenimiento durante el proceso de transición. Dicho trámite concluyó el 28 de noviembre de 2005 me-diante la elección de la Junta de Directores. No obstante, el peticionario cobró las mensualidades de mantenimiento co-rrespondientes al mes de noviembre de 2005. Evidente-mente, erró al así hacerlo.
El peticionario aduce que durante la Asamblea de Titu-lares celebrada en octubre de 2005 le notificó a los condo-minos que a partir del mes siguiente comenzaría a cobrar las cuotas de mantenimiento. Este hecho, por sí solo, no valida su actuación de recolectar las mensualidades a los titulares antes de que se concrete el traspaso de administración. La Ley de Condominios no le confiere esa autoridad. Además, la Minuta de la asamblea no refleja que los titulares hayan accedido al referido cobro prematuro.
Más aún, nos percatamos de que en la Escritura Matriz del régimen del Condominio Portal de Sofía el peticionario *967 dispuso que su pago de cuotas de mantenimiento de las unidades no vendidas iniciaría “una vez se [hubiese] tras-pasado la administración del Condominio a la nueva Junta de Directores”.(14) Esta cláusula es patentemente contraria a las acciones del peticionario respecto a los titulares del edificio.
Es pertinente recordar que una vez se traspasa la admi-nistración del inmueble al Consejo de Titulares, el desarro-llador pasa a ser considerado como un titular más con las mismas obligaciones que los demás condominos. Esto in-cluye el deber de aportar proporcionalmente a los gastos de mantenimiento de las áreas comunes correspondientes a los apartamentos que aún no se han vendido. Según esa doctrina ampliamente conocida, el peticionario indudable-mente falló al pretender bifurcar el pago de las cuotas de mantenimiento. Imponer a los condominos el cumpli-miento con esa obligación legal en un momento precedente a aquel convenientemente elegido por él en la Escritura Matriz, es un acto reprochable que dista del fin público promulgado por la Ley de Condominios y resulta contrario a los principios de buena fe que deben imperar en las rela-ciones contractuales.
En fin, según la discusión que precede, concluimos que el peticionario incidió al recolectar de los titulares las cuo-tas de mantenimiento correspondientes a noviembre de 2005, ya que a esa fecha la administración del edificio aún estaba bajo su control. Reafirmamos que, de acuerdo con el Art. 36-A de la Ley de Condominios, supra, la obligación de los condominos de aportar a los gastos de mantenimiento y conservación de las áreas comunes se activa una vez haya concluido el traspaso de la administración al Consejo de Titulares mediante la elección de la Junta de Directores. Consecuentemente, en el presente caso procede que el De- *968 sarrollador le reembolse al Consejo de Titulares las canti-dades que les cobró a los titulares por concepto de las cuo-tas de mantenimiento correspondientes al mes de noviembre de 2005.
V
Por los fundamentos antes expuestos, se confirma la Sentencia que emitió el Tribunal de Apelaciones. En cuanto a la restitución del dinero que el peticionario, Portal de Sofía, Inc., cobró indebidamente, acogemos el procedi-miento que estableció DACo en su Resolución. Así, el peti-cionario deberá reembolsar la cantidad adeudada al Con-sejo de Titulares del Condominio, quienes deberán acreditar a la cuenta de mantenimiento de los titulares concernidos la suma correspondiente a la mensualidad pagada.

Se dictará sentencia de conformidad.

La Juez Asociada Señora Rodríguez Rodríguez disintió con la expresión siguiente:
La Juez Asociada Señora Rodríguez Rodríguez disiente por considerar que el Tribunal legisla una enmienda a la Ley de Condominios en peijuicio de la metódica estructura legislada por la Asamblea Legislativa. Lo cierto es que el texto de la ley “interpretada” en este caso es claro y no se justifica intervenir con las posibilidades que la ley le reconoce a los desarrollado-res que someten al régimen de propiedad horizontal sus propiedades. No dudamos que la enmienda judicial a la Ley de Condominios, al alejarse del cuidadoso texto legislado, habrá de perjudicar la maltrecha industria inmobiliaria en el país y conllevará efectos desfavorables no solo para los desarrollado-res, sino para los consumidores, a los cuales la mayoría pro-clama proteger.
La Jueza Asociada Señora Pabón Charneco no interviene.

 Escritura Núm. 12 otorgada el 21 de enero de 2005 ante la notaría Adela Surillo Gutiérrez. Apéndice de la Petición de certiorari, págs. 112-319.

 íd., pág. 312.

 Minuta de Reunión de 19 de octubre de 2005, Apéndice de la Petición de certiorari, pág. 338.

 íd.

 Querella de 6 de febrero de 2006, Apéndice de la Petición de certiorari, págs. 48-51.

 Exposición de Motivos de la Ley Núm. 103 de 5 de abril de 2003. Véanse, también: D.A.Co. v. Junta Cond. Sandy Hills, 169 D.P.R. 586, 597 (2006); Arce v. Caribbean Home Const. Corp., 108 D.P.R. 225, 242 (1978); M.J. Godreau, La Nueva Ley de Condominios, San Juan, Ed. Dictum, 2003, pág. 11.

 Exposición de Motivos de la Ley Núm. 103, supra.

 Íd.

 Alegato del peticionario, pág. 14.

 Véase Godreau, op. cit, pág. 36.

 íd.

 Exposición de Motivos de la Ley Núm. 103 de 5 de abril de 2003, (Parte 1) Leyes de Puerto Rico 355, 357-358.

 Informe de la Comisión de Desarrollo Urbano y Vivienda de la Cámara de Representantes de Puerto Rico sobre P. del S. 1425 de 3 de marzo de 2003, págs. 2-3.

 Escritura Núm. 12, supra, Apéndice de la Petición de certiorari, pág. 312.